COALTER*
delivered the opinion of the court.
These cases, with slight variations, present the same question, as to some parts of the controversy, and have therefore been considered, and will now be decided together. As to some of the notes, the circumstances vary, and where that is the case, they will be considered separately. So far as they agree, they present the following case, according to the statements in the bills.
That filed by Alcocke states, that in November and December 1816, Robert Campbell applied to him to sign, in blank, two notes, negotiable at bank, which he stated were to be made payáble to himself; that they would be of essential service to him for some very important purpose; that if he used them he would pay them off when due; and that having confidence in him, he did accordingly sign the notes, without value, so that in fact he was merely his surety. That after this, it appears, that Joshua West, (who is plaintiff in the 2d suit, and seeks relief also as to this note and two others,) signed one of these notes in addition to the signature of the plaintiff, which was filled up, with the sum of $210 and made payable to Campbell, and it appears was transferred to Thomas Maulé. As to the other note, the circumstances varying from those in regard to that just now stated, it will be noticed hereafter.
These notes it is stated, were neither deposited in bank, nor protested, and that on enquiry of Campbell, he told him they were discharged to the satisfaction of the holders. He charges, that they were so discharged at least as to him, because although they fell due in December 1816, no proceeding was taken by the holders to force payment until March 1817, when Maulé brought *suits on them, and he dying, they were revived by the appellee his ad-ministratrix : and judgment was obtained on the said note against himself alone, process not having been served on West: and in the other case against himself and Campbell, who as will be hereafter more particularly stated, was a joint maker of the note with him. That after the judgments, the administratrix well knowing, as he believes, that Campbell alone was her debtor, entered into an arrangement with him separately, for the payment of the said claims; gave him further credit for said debts; took a deed of trust on real property dated in July 1818, giving day of payment until Eebruary 1819, and when that day arrived, gave a farther indulgence until March, and then- till April, when the property was sold; and not selling for enough to pay the debts, she had resorted to executions on the judgments. That these indulgences on the deed had produced a loss, real property in Richmond having greatly depreciated &c. ; and in co'nsequence of all these acts, he, being merely a surety, was exonerated; these latter transactions being all without his knowledge or consent.
The bill of West charges — -That in December 1816, in order to secure certain sums alleged to be due from Campbell to Maulé, he, Campbell, agreed to give him several negotiable notes, to wit, 'one for $210, executed by Alcocke and the plaintiff, and indorsed by Campbell; another made by the plaintiff payable to Campbell for $130; and a third made by the plaintiff and Bennett for $300 payable to Campbell. That in these transactions, he had no interest except as surety for Campbell, for debts due to Maulé, who he charges well knew the situation in which all parties stood; that these notes were neither put in bank nor protested, and consequently Maulé sued the makers only. He then states the abatement of these suits by Maule’s death, their revival, and judgments by the administra-trix. That Maulé having failed to protest &c., had discharged Campbell, and by *thus lessening the liability of any of the parties, he thereby absolved any one who stood, in reality, as surety. That his administratrix, after the judgments, and knowing in reality that Campbell was her principal debtor, entered into an arrangement with him, by taking a deed of trust, &c., giving day of payment &c., as stated in Alcocke’s bill, and this without his knowledge or consent. This for the reasons alleged by Alcocke, he also contends discharged him.
The bill of Bennett, which relates to the $300 note, mentioned in West’s bill, as made by those two parties to Campbell, makes the same allegations, almost verbatim, with those made in West’s bill, and why he did not join in that suit, I cannot well understand; his alleged ground for relief being precisely the same.
Although in Alcocke’s bill, there is no allegation, that Thomas Maulé, when he discounted the notes mentioned in that bill, knew the situation of the parties, yet as the $210 note, is one subject of controversy in West’s case, in which that charge is made, if that case is thereby made stronger than Alcocke’s, and he should be discharged in consequence thereof, that decree might possibly avail Alcocke also in some way or other, and therefore it will be proper perhaps, to consider that allegation as extending to both cases.
The questions presented by the bills then are:
That Alcocke as maker, and having confidence in Campbell, was to execute notes to him, in blank, to be filled up at pleasure and for important purposes to Campbell, not made known to Alcocke; and, that in the other cases, notes, for specific sums, were to be made by the parties to Campbell, who was to indorse the same to Maulé, to secure certain debts alleged to be due from the former to the latter; and consequently this was the important purpose unknown to Alcocke, for which the $210 note was to be used. That Maulé knowing that he was *925 not receiving these notes to secure a debt due to ^Campbell, and not from the makers, was to consider them merely as sureties, in the same manner as if Campbell had united in ordinary notes or bonds with them as his sureties; that though these notes were negotiable in bank, and consequently stood upon the footing of foreign bills of exchange, this will not vary the nature of the liability of the alleged sureties; and that therefore, 1st those sureties were discharged by a failure to protest the notes: 2d if this does not discharge them, yet the adminis-tratrix, although it was voluntarily offered, could not take collateral security from a man, thus absolved, without their consent, she also knowing their situation ; and that having done so, they were thereby discharged.
These propositions will be considered as on a demurrer to the bills. I prefer this course, because in my opinion, the greater part of the only testimony in the cause is not pertinent to the issue. If these bills had been filed against Thomas Maulé himself, the testimony in relation to all the notes previous to those spoken of in the bills, which were taken in, and are now filed with that deposition, would probably not be within the issue; at least so as to make any better case than that stated in the bills, though he was privy to that transaction ; because no opportunity was given him to answer to, and explain them; a fortiori they cannot operate against an ad-ministratrix, who, though the wife of the party and possibly acquainted with some of the transactions, ought to have been apprised of the whole ground of complaint. The most that the parties can claim, is, that their bill shall be taken as true.
They have no claim to relief 'on the first point, because the failure of Thomas Maulé to have the notes protested is not alleged to have taken place, in consequence of any contract, by which he received any other security from Campbell. This discharge of Campbell arose from the lapse of time, the negligence of Maulé, or his inability to procure the proper protest and notice. Had he ^placed the notes in bank, the complainants must either have paid them, or have been themselves protested, and their credit impaired; and then, on notice to Campbell, he would have been bound; but no negligence of a creditor, which, according to the law of the contract, may operate a discharge of the principal, as in case of a joint bond, before the statute on that subject, where the principal dies, leaving no personal assets, can discharge the security. He must do some act, make some new contract, or must faii to sue, after notice, under the act, which is substituted for the bill quia timet, or to sue after decree to that effect on such bill, in order to discharge such security. Had a bill been filed or even notice given requiring Maulé to have these notes put in bank and protested, if not paid, there might be some ground for the first proposition.
As to the second. — The bills themselves admit the law of the contract, and the nature of the respective liabilities of the parties to be, that the maker of a note of this kind is, at all events, bound to pay; the indorsee only, in case due diligence is used, and notice given, &c. and that for want of this, Campbell is discharged.
In taking a note of this kind, there can be no difference between taking it in discharge of a pre-existing security for a debt, due from the indorser to the holder; and discounting it in the first instance, by advancing money to the indorsee upon it, the person discounting it, knowing at the time, that the note was made merely for the accommodation of the indorser: The extin-guishment of the prior security, and taking this in discharge of a prior debt, is equal to a new advance of money, or full value given in discount for the note. If this be true, the case perhaps will be simplified by considering these notes to have been discounted by Maulé, by advancing the money to Campbell when he received them. What then is the nature of the liability of the maker of a note of this kind, or of the acceptor of a bill of exchange? An *acceptance is an engagement to pay the bill according to the terms of the acceptance, and the making of a note is equivalent to the acceptance of a bill, (d) The effect of the acceptance is to give credit to the bill, and to render the acceptor liable as above; it implies an acknowledgment that he has effects of the drawer in his hands; as the making of a note implies, that money was lent by the payee to the maker, (e) this may not be the fact in either case, and therefore as between the drawer and acceptor, the maker and payee, their remedies against each other, will depend on the fact as it exists between them; but with regard to every body else, the acceptor of the bill, and maker of the note, are regarded as the original debtors, and an acceptance once made cannot be revoked ;(f) and it is of no consequence whether it is known to the party, at the time he took the bill or not, that there were no effects in the han ds of the acceptor, or value given by the payee of the note. The holder is not to be affected by these circumstances, for by making himself a party to the instrument, he contributed to its currency, and that perhaps was one reason, on which the holder parted with his money.
The design of the law of merchants in thus distinguishing these from all other contracts, was for the convenience of commerce; that they might pass from hand to hand in the way of trade, in the same manner as if they were specie, (g)
This being the law of the contract, and the nature of the liability, lean find neither law nor reason to satisfy me, that this court can change it.
The agreement of the party if fairly entered into, and for valuable consideration may change it; may substitute a new contract for that which originally existed, but no such new contract or agreement is charged. The proposition ^contended lor is, that the creditor, by procuring-part of the debt to be paid by Campbell, who was discharged, instead of forcing the *926 whole from the plaintiffs, discharged the surety.
How can this court say, that these notes in the hands of Maulé shall be of less value than in the hands of his indorsee, and be clogged with difficulties which would not exist as to the latter? Or are we prepared to say, that the circumstances existing between the makers and payee are to pursue these notes wherever they go? A party discounts a note, knowing it to be an accommodation note. It is drawn by A. and indorsed by B. ; he is satisfied that A. is good, he knows that B. will be discharged, if, by any accident, the note is .not protested, &c. He is willing to risk this, because he does not rely on B., but he would not have discounted a note made by B. and indorsed by A., because A. might, by accident, or jnistake, be discharged. To whom then does he, in realitj', advance his money? To A., who has given B. this letter of credit. An indorsement made in blank, with authority to fill up a note, is a letter of credit to any amount;(h) and it is immaterial whether the person, taking the note, on the credit of the indorsement, knew whether it was made before drawing the note or not; a fortiori, is the making of a note for a definite sum, a letter of credit to that amount. The former was disputed, but settled as above, the latter never has been.
The law, as to discounting paper, is the same in regard to banks, and individuals. They discount accommodation paper, every day, knowing it to be such. They know that the indorser really gets the money and that the maker has received no value. The indorser attends to the renewal of the paper in bank. If he fails to take it up, his credit is gone unless he can satisfy' the banks that the maker is his debtor, and ought to take *it in, and that he wishes to proceed to a protest, in order to compel him to do him justice. But suppose this is not the fact, and the maker -prefers that the bank shall proceed to a protest rather than renew his note; but by some accident there is no protest; will this discharge the maker? It will if the first proposition contended for be true. But it will not. The indorser though desirous still to do justice to the maker, and to restore his own credit in the bank, although he has been discharged for want of a protest, offers to give the bank collateral security on land: the bank is fearful that both maker and indorser may fail; are they restrained from taking this collateral security from the indorser even if he had been protested, and still liable, because it will operate a discharge of the maker? I think not. But if the indorser is discharged, for want of protest, there can be no doubt, even if the maker was so unjust to himself as to forewarn them from doing so, except on that condition. But suppose such security was offered and the bank refused, and the maker by a bill quia timet should call on the bank to take the security at least for his benefit, and the rpadiness to execute it was admitted in the answer of the indorser, would a court of equity hesitate to give relief? Can it be wrong then to do it voluntarily?
But it may be said that the indorser, although discharged for want of a protest, may still be made liable in equity to the holder, because he received the money on a • note for which no value was given by him, and as the paaker is insolvent so that the holder cannot get it of him, the indorser ought to pay. But to this he may reply, that the maker having become solely responsible, he had left funds in his hands, or they were retained by him to the amount of the note, so that, in reality, he has paid value for it. He would therefore in no way be liable. This shews the wisdom of the law in determining, that the circumstances which may exist between the maker and payee, which may be one thing to day and *another to-morrow, are not to affect the note or bill. The maker and acceptor are to be considered to all intents and purposes, the original debtors, the persons to whom the credit was mainly extended, and who are bound at all events to pay. If this is not to continue the law, the free negotiability of these papers is to cease.
Suppose this case — A. as principal and B. as his surety, enter into a joint bond, before the act concerning joint rights and obligations. A. has a large real, but no personal estate. He dies, so that B. as survivor must pay the debt. The heirs of A. though, agree to give as collateral security, a deed of trust on lands, to secure the debt, and procure indulgence to B. their ancestor’s surety; the lands are sold and pay half the debt; all this is done without the knowledge of B. Is he discharged from paying the other half of the debt?
I can find po case where because a note or acceptance on a bill has been made for the accommodation of the payee, or for the honor of the drawer, that the party has resorted to equity for .relief, on the ground that he was merely surety, and that the holder had negotiated without his consent or knowledge; with the payee or drawer; had taken other notes, given time &c. Indeed, it was some time disputed whether if he had received the money from the drawer, the acceptor was not still liable; but it was settled he was entitled to credit for any thing the drawer had paid, (i)
Numerous such cases as this doubtless have occurred, and if the principles above stated did not directly oppose such relief — if it would not go to destroy the whole system of bills of exchange, which depend on the law merchant — a law co-extensive with the mercantile world, such cases would doubtless be found. Those cases are applicable to bonds and other instruments whereby the principal and surety are bound by equal bands, and subject *to like remedies. There is no ca'se that I can find, where a party has made himself principally subject for the debt of another, in which merely because that is the fact, the court has undertaken to change the nature of such liability. As if A. gives his bond for a debt due by B. this discharges B., he then owes A., but he may discharge *927 this debt, in part, by paying- so much ior A. in discharge of this bond. And this in any way and at any time, which he and the creditor may agree upon, and this without affecting the liability of A. for the balance.
An indorser and a fortiori a maker or acceptor, is not discharged from his engagement, except by the absolute payment of the money, (k) A judgment by the holder against the drawer, even if he is taken in execution, and let out on a letter of licence, will not discharge an indorser, much less the acceptor. (l) But the acceptor may be discharged by express agreement, or something equivalent thereto. The case of Dingwall v. Dunster, in Douglas(m) is of this kind, but there the party aid not come into equity upon the principle contended for here; but defended himself at law upon the ground, that he was an acceptor of an accommodation bill; and the plaintiff knowing this, had for a series of years, and without calling on him, been receiving payments from the drawer; and had not replied to a letter of his, thanking him therefor, and stating that he had heard the drawer had taken in the bill, so that he was thrown off his guard; and yet he was not held to be discharged. In that case, the drawer whose liability is of the same nature with that of the payee who indorses a note, had not been discharged as in this case Campbell was. Buller says, nothing but an express agreement can discharge the acceptor.
*The case of Ellis v. Galindo, found in a note to this case, strongly supports the same doctrine. In that case, the acceptance was probably for the accommodation of the drawer who was a brother. When the bill fell due, the plaintiff received of the drawer 31. IS. 4, and this indorsement was then made on the bill: “Received on account of this bill 31. IS. 4, balance remaining 261. 4. 8. I promise to pay to Mr. T. Ellis, within three months from the date of this.” Signed by the drawer. The balance was never paid, and after three years, suit was brought against the acceptor Lord Mansfield thought the acceptor discharged, and nonsuited the plaintiff. On motion for a new trial it was contended for the plaintiff, that the indulgence for three months could no more be held a discharge, than the payment of a part by the drawer &c. Lord Mansfield said, the doubt is, whether the question ought not to have been left to the jury, it being a question of intention arising out of the circumstances, that is, whether the party, by this new note giving time, and a delay of three years &c., intended to look to the drawer only; not whether he was bound to do so, in consequence of these acts, if he could clearly have shewn there was no such intention. As if he had given notice to the acceptor, that he would still look to him if the drawer failed to pay.
WILLES J. thought it ought to have been left to the Jury.
BULLER" J.
“There is no doubt as to the law. It is as has been stated by the counsel for the plaintiff. I rather think the case should have gone to the Jury. This indorsement could not have been meant as an additional security, for the drawer was equally liable before, (i. e. he had not been discharged by laches, &c.) I should have left the case to the Jury, but with very strong observations.” But if in that case as in this, the party had been discharged for want of diligence, and the in-dorsement *had been taken as additional security, as in. that state of things would necessarily have been the case, there would have been no ground to suppose, that the intention was to discharge the acceptor, except the lapse of three years before the demand, which does not exist in this case. But no agreement of this kind is in issue, and the case is only referred to, to shew, that no acts which do not amount to an agreement to discharge the party, will operate that discharge, under the principles contended for in these bills.
The case as to these notes is not made better for the appellants by the answer and testimony.
The apswer denies knowledge in herself, and, as far as she knows and believes, in her testator, of the alleged situation, in regard to each other, of the makers and in-dorser of these notes. In further response to the bills it denies any communication with Campbell respecting the deed of trust, &c. until after its execution. That his willingness to enter into that arrangement was stated to her by the sergea.nt of the city, in whose hands the executions against the appellants were, and she believes it was made with their knowledge, who stated there would be some difficulty in making the money; and that she agreed thereto, and to suspend the executions for a short time, upon the express proviso, that her remedy on the judgment was not to be affected; and if that was to be the case by the indulgence, she denies that she was bound to give any. She admits the subsequent indulgence was at Campbell’s request, but without a.ny consideration, and therefore not obligatory on her. As to the suis being against the makers only, she knows nothing ; that being directed by her counsel whom she supposes did what was legal and proper. She refers to the deed of trust as part of her answer. It bears date the 1st July 1818, and recites that the grantor Campbell, being indebted to Margaret Maulé, administratrix, &c., in the *sum of $1222 79 being the aggregate of principal and interest of certain judgments recovered against said Campbell, John Alcocke and Chas. Bennett; and whereas she has thought proper to extend the time of payment on taking this indenture as collateral security, and hath agreed to suspend the executions until the 1st of January 1819, &c. in the usual form.
Campbell is the onlj' witness examined in the cause. He goes back to the year 1814 for the origin of these notes, and among other things states, that very heavy usury was practised by Thos. Maulé on him, &c.
This statement, I suppose, was intended to have some effect in this cause, either to support his credit as a witness, or to excuse him for the effort he has made, and is mak *928 ing, to throw the loss o± this debt on this administratrix and her sureties, rather than on his own sureties. It can have no operation in the case, except so far as it may affect his own credit as a witness. It may affect that, and seriously too, in the following way. As it regards .the debts due by the notes under consideration, if the makers are discharged, he can only be subjected to pay their amount by a suit in Chancery, on the ground that he received the money and has never paid it to any one; or by a suit on the note given at the time he executed the deed of trust; in either event, he can plead usury, and the makers, being discharged, may be important witnesses for him; but if the makers are not discharged, but are obliged to pay the money, he cannot avail himself of the usury as to them. It subjects the credit of a witness so situated, to scrutiny, in consequence of any ' bias arising from his wish that one or the other party might prevail; and he states himself, that he considered it his duty, to save his own sureties; and surely these circumstances will take not a few grains from the weight of his testimony. But the most creditable, unimpeached, and positive testimony of one witness, will not overthrow the answer. I am therefore bound to believe the answer ^against the witness, even when he positively says, that he had frequent communications with the appellee before entering into the deed of trust.
Again — I am bound to believe the answer which denies knowledge, because there is only a single witness, and he is not positive. He says from various conversations with the administratrix in the life time of Maulé, without detailing those conversations, he believes she knew, &c. This part of his deposition is no evidence at all; and would be struck out, if the deposition was to be read to a Jury as .to the other matters. It is surely not necessary to prove this position. The deed of trust referred to in the answer, does not prove knowledge. It speaks of judgments against all the parties, and she did not know but Campbell was sued as indorser. Besides, he had been in-dorser, and if all the parties had received the money, each would have been principal and each a debtor for the whole; so that the statement that' he was debtor for the whole, does not necessarily imply, that he received all the money, and that she knew it. A deed is prepared to secure part of the debt, at least; this deed has reference to all the parties; stipulates immunities or indulgences to all; is offered by an officer who is pressing all with executions, in a way to induce belief, that he acted for all. It is not made to her individually, so as to shew and apprise her, that she was changing the nature of the debt, taking it upon herself, and probably subjecting herself and sureties, to a devastavit, but in her character of administratrix; and because under these circumstances she grants a short indulgence to all the parties, she and her sureties are to be answerable for the insolvency of Campbell, under a concealment of the real situation of the parties. Why did not Campbell tell her, that he was really the principal and wished to exonerate his sureties? He could then have-sworn positively to her knowledge. That might have put her on her guard, and ^defeated his object. Why does not. Campbell swear, that at the time the deed was made, the property-was worth the debt? That he intended to save his sureties, by giving a full pledge for the debt. If this was not the way he intended to save them, but yet intended to sáve them, and in consequence of which he told them he had saved them, how did he intend to do it? He says that he considered himself bound to save his sureties. And for that reason, he made the agreement with Mrs. Maulé, without consulting, or giving any information thereof to them. He was bound by his. oath, and could not rest on his pill'ow, when sworn to tell the whole truth, without disclosing this important secret. If he intended to save men who were harrassed with, executions on his account, by paying the cdebt, or giving ample security for the payment of it, would he have concealed such intention, and such ability for a moment, from men, whom he was meeting every day in the street, and whose property or persons-were in jeopardy on his account? Is there a tittle of proof to shew, that this property fell one cent in its value after the deed of trust was executed? If not, what kind of security was it? only worth on a fair sale not quite $300.
Although a court of equity will not set up an obligation against a security which has been fairly extinguished at law; but will leave the creditor to his legal remedies ; it will do so if it has been unfairly extinguished by the principal, (n) They shall not avail themselves of his improper acts: a fortiori, if they come into equity, when they are bound at law, they will not be permitted to avail themselves of his improper conduct.
This argument, if it applies to these nptes, applies with equal force to the one for $315 in which Campbell was a joint maker with Alcocke. But Mrs. Maulé had a bright to apply the proceeds of' this sale to that debt, and although she had agreed in her answer to distribute it among all pro rata, yet as that is not accepted, before I would subject her to a dev-astavit for this debt, I would, under the whole circumstances of this case, so apply it. But at farthest a pro rata credit should be given, and the injunction only perpetuated for the residue, making her loss only equal to that residue.
But there is another ground as to this-note, which I think puts it beyond doubt, and which equally applies to the other notes, if I am wrong on every ground I have taken as to them.
The only principle on which a surety can get relief, agreeable to the case made in the bills is, that he has been deprived of his bill quia timet, by a contract between the creditor and principal, by which the creditor has tied his hands. By that bill, the surety calls on his principal to pay up the debt and exonerate him, and on the creditor to sue both, or issue executions according to judgments obtained, and, in that *929 way, as far as possible, to force the principal to pay. Had such bill been filed by these parties what would have been the effect? As to all the debts except that due on the note now particularly under consideration, Mrs. Maulé would have directed the executions to proceed against the plaintiffs only. She could not have been compelled to sue Campbell as indorser, because there was no remedy at .law against him; and as this bill would bring him before a court of equity, that court would at once decree against him, according to the circumstances as they might exist between the makers and him. She would also have directed the execution to issue, or to be proceeded in, against Alcocke and Campbell,,on the note now under particular consideration. Should Campbell file a cross bill to set up this agreement by the deed of trust to grant indulgences, she would say, that by the very terms of that deed, it was not *to be the sole surety for these debts, so as to discharge all the parties but him; it was taken only as collateral security, and under a belief, that all parties so understood it, and was expressly so understood by her; as the deed of trust shews. It is to operate so as to give her this as her only security; and so as not to suspend merely, but extinguish her executions: she made no such agreement. Would a court of equity, under the case now made out, compel her to suspend them, and thereby produce that effect, even if there had been no concealment or design on the part of Campbell to produce that effect? I think surely they could not. The parties then would not have been deprived of their bill quia timet, certainly not as to the notes from which Campbell, as indorser, was discharged.
But in West’s bill, there is a note drawn by himself alone, indorsed by Campbell, as to which there is no ground for relief of any kind. The answer states, that that note was not embraced in the deed of trust; and Campbell admits in his deposition, that it was not. He says indeed, that all the debts for which either Alcocke, West, or Bennett were bound, were intended to be covered; but that this was left out by mistake. The deed only provides for those cases, in which there were judgments against Alcocke and Bennett. Then as to this debt, there is not only no agreement, no collateral security, but the bill does not even mention that it was intended to be embraced.
There may be other notes in this situation ; for Campbell admits that judgments were not obtained on all the notes, at the time the deed of trust was given; but what were the existing judgments, and what obtained afterwards, does not appear. It shews however the looseness of this transaction ; and affords a farther proof, that no one considered the debts secured by this deed. That it was a mere effort to save as much as possible ''''from Campbell, by taking security on such real estate as he chose to offer.
On every ground, therefore, I am for affirming the decree.
CABELL, Judge, concurred with CO ALTER, and JUDGE BROOKE not sitting in the cause, the decree was affirmed.

Brookb absent.

(a) Kid. 68.

(e) lb. 186 and 197.

(f) lb 7-1. 89,109. 10, 476.

(g) lb. 167 and Sir. 441.

(h) Kid. 89; 1 H. Bl. 88, 89; Day 496.

(1) 1 H. Bl. 88..

00 Kid. 112, 116.

(1) 111. Rep. 1235.

(in) Doug-. 217.

(n) 3 Atkins, 93.